UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PATRICIA KENNEDY                                    :
                                                   :
              Plaintiff,                           :
                                                   :
v.                                                 :    Case No. 9:17-cv-80103-RLR
                                                   :
OMEGA GAS & OIL, LLC,                              :
                                                   :
              Defendant.                           :
_____/

### PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, PATRICIA KENNEDY, by and through undersigned counsel, and pursuant to

the Order of Court, hereby submits the Proposed Findings Of Fact And Conclusions Of Law,

attached hereto.

**I HEREBY CERTIFY** that, on October 9,  2017, I electronically filed the

foregoing  with the Clerk of the Court using the CM/ECF system which will automatically send

e-mail notification of such filing to the attorneys of record.

By:   */s/ Thomas B. Bacon*
Fla. Bar No: 139262
Thomas B. Bacon, P.A.
644 N. Mc Donald Street
Mt. Dora, FL 34949
Email: tbb@thomasbaconlaw.com
Phone: (954) 478-7811

Attorneys for Plaintiff

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for bench trial on October _____, 2017. After consideration of the evidence and testimony adduced by the respective parties, the Court makes the following Findings Of Fact:

1. Plaintiff, Patricia Kennedy, is a disabled person as that term is defined by Title III of the Americans With Disabilities Act, 42 U.S.C. 12181, et seq. ("ADA"). Ms. Kennedy is unable to participate in the major life activity of walking more than a few feet without the aid of a wheelchair or other assistive device and is unable to stand without something to hold on to. She ambulates outside of her home primarily by wheelchair. She also has limited use of her hands and is unable to operate mechanisms that require pinching, tightly grasping or twisting of the wrist.

2. Defendant, Omega Gas & Oil, LLC., owns and operates a place of public accommodation located at 1974 S. Congress Ave., West Palm Beach Florida. This is a gas station and convenience store. As a gas station and convenience store, this place of public accommodation derives substantial revenue from traveling patrons, including persons coming from other counties or states and traveling from many miles away. Also, this store is located on Congress Ave. This is a main thoroughfare and is situated near both I-95 and the Florida Turnpike. Customers patronizing the facility do not make plans months, weeks, or even days in advance to purchase gas or a convenience store item, such as a candy bar.

2

3.     Ms.. Kennedy testified how various barriers impact her.  She testified that she needs to park in disabled parking spaces to more easily access a property entrance. She is unable to use restrooms that are too small for her to maneuver in her wheelchair. Obstructions impede or prevent her ability to maneuver. She requires compliant grab bars behind and beside commodes to access them.  She has difficulty operating door knobs and round sink faucets, but instead requires lever/paddle hardware to avoid having to tightly grasp, pinch and twist of the wrist to operate. She is unable to use amenities, such as soap dispensers, paper towel dispensers, dryers, toilet paper dispensers, if they are outside of the required reach ranges or obstructed.     Unsecured floor mats/carpeting create a risk of catching her wheelchair tires and either obstructing her or creating a danger of tipping.  Sinks with pedestals prevent her from putting her legs underneath to wash her hands.  If a commode flush control is on the side nearest the wall, she would not be able to flush. She also requires a sufficiently wide accessible route throughout a facility, free of obstructions, to safely navigate.

4.     On January 14, 2017, Kennedy visited Defendant's place of public accommodation.

5.     At this facility, Kennedy testified that she encountered barriers to access which discriminated against her on the basis of her disability and filed this action seeking injunctive relief pursuant to Title III of the Americans With Disabilities Act ("ADA"). 42 U.S.C. Section 12181, et seq.   Ms.  Kennedy returned to this facility on July 18, 2017.

3

7.     Plaintiff testified that she intends to return to the subject facility once this litigation is concluded.

8.     Ms. Kennedy testified regarding the violations she observed and encountered on her first visit. She submitted pictures depicting those conditions.

9.     First, Ms. Kennedy was unable to utilize the designated disabled parking space. Said space had badly faded paint and was barely distinguishable. More significantly, the disabled parking space was cluttered with obstructions. These included a dumpster sitting partially in the space and partially across the access aisle. A large heavy equipment was also parked in the space.  These two obstructions rendered the parking space completely unusable.

10.    Kennedy was also unable to use the restroom. It was so inaccessible, that she was unable to even enter, but had to look into the restroom from outside, as the pathway to the restroom door was inaccessible. From the outside, she was able to see the conditions therein. One grab bar was missing and the other grab bar was too short. It was unmaneuverable to wheelchairs. A mop bucket and trash can obstructed the maneuvering space in the restroom as well as access to the commode and sink. The flush control was on the wrong side. The hand dryer and paper towel dispenser were too high and obstructed. The sink had inoperable knob faucets, obstructions underneath and a pedestal, which prevented wheelchair access. The door had an inoperable knob. An unsecured floor mat/carpet was on the floor. Inside the store, an unsecured floor mat/carpet was in the doorway.

11.     By the time of Kennedy's subsequent visit, on July 18, the Defendant had

eliminated the original handicap parking space and created a new space. However,

Kennedy again was unable to park in the new parking space as this space was

obstructed with office furniture.

12.     Plaintiff commenced the instant action on January 1, 2017. Defendant filed an

Answer and Affirmative Defenses on April 17, 2017 which denied the existence

of violations on the one hand. On the other hand, Defendant also brazenly

announced its litigation strategy as follows:

> "Defendant intends to correct those conditions that Plaintiff complains of
> to the extent readily achievable and technically feasible thereby making it
> unlikely there will be any future discrimination; once the corrections are
> complete, the case may be rendered unnecessary and Plaintiff would not be
> entitled to relief including recovery of attorney's fees if Defendant
> removes all barriers from its facility prior to an alteration in the
> relationship of the parties."

Aff. Defense para. 2., DE 17.

Defendant's ensuing litigation strategy has been to make good on this

promise by availing itself of the delay to trial by hastily making alterations at the

property in an effort to moot the case and deprive Plaintiff's counsel of their

reasonable fees, costs and litigation expenses.

13.     Plaintiff also submitted the testimony and report of her expert, Carlos Herrera.

Mr. Herrera is a general contractor who specializes in ADA construction.  He has

held his general contractor's certification since 2008.  He has a Bachelor's Degree

in civil engineering. He has been a certified accessability inspector/plans examiner

since 2003.

5

14.     Mr. Herrera inspected the premises on June 6, 2017.   By the time of this

inspection, Mr. Herrera observed, surveyed and measured conditions as they had

been altered by defendant in response to this lawsuit.  In each instance, Mr.

Herrera provides photographs and measurements, cites the applicable regulations

violated, proposes a correction and provides an estimated cost. Despite this

inspection having occurred subsequent to Defendant's remediation attempts, Mr.

Herrera found a significant number of continuing violations.

A.     Defendant had relocated the disabled parking space and access aisle. Mr.
       Herrera found that this new access aisle was not properly painted.

B.     Mr. Herrera found that the new parking space sign did not comply with
       applicable regulations.

C.     Mr. Herrera observed that the new handicap parking space was obstructed
       by furniture.

D.     Mr. Herrera observed that the signage on the restroom was not proper.

E.     Mr. Herrera observed that there was insufficient level clearance at the
       restroom door.

F.     Defendant had replaced the commode in response to the lawsuit, but Mr.
       Herrera found that the flush control, although moved, was still non-
       compliant.

G.     Although the commode had been altered in response to the lawsuit, Mr.
       Herrera found that it was improperly located.

H.   Mr. Herrera observed that the restroom lacked the required maneuvering space.

I.   Mr. Herrera observed that the hand dryer was improperly located.

J.   Mr. Herrera found that the lavatory was at an improper height.

15.   Mr. Herrera also incorporated the photographs of conditions observed by the Plaintiff on her initial visit, but altered by Defendant in response to the lawsuit and prior to his inspection.

A.   The original access aisle was improperly marked and the paint was faded as a result of Defendant's failure to maintain the condition.

B.   The original handicap parking space had improper signage.

C.   The handicap parking space had been used to store equipment and a dumpster, due to a failure to maintain the space free of obstructions.

D.   The floor mat in the entrance doorway was not firmly attached to the floor.

E.   The water closet side grab bar was too short.

F.   The water closet rear grab bar was missing.

G.   The restroom door had improper knob hardware.

H.   The commode flush control was on the wall side.

I.   The hand dryer and paper towel dispenser were improperly located.

J.   The sink had improper faucet hardware.

K.   The floor mat in the restroom was not firmly fixed to the floor.

L.   The lavatory had insufficient knee clearance.

M.   A trash can and mop bucket obstructed maneuvering spaces and access to the features in the restroom.

16.   Plaintiff subsequently returned to the property on July 18. On her revisit, she also observed that the handicap parking space was still cluttered with the same furniture observed by Mr. Herrera on June 6, 52 days prior.

17.   Several of the violations identified by Mr. Herrera and by the Plaintiff were characterized by Mr. Herrera as being the result of a failure to maintain features required to be accessible. These included:

1.   the faded paint in the first handicap parking space;

2.   the use of the first handicap parking space as storage for a dumpster and heavy equipment;

3.   the use of the relocated handicap parking space for storage of office furniture; and

4.   the presence of the mop bucket and trash can in the restroom.

18.   Additionally, Herrera stated that none of the above conditions are permanent in nature. Rather, they are all subject to wear and tear, are frequently changed, and must be maintained and be kept free of obstructions. Features that deteriorate and must be maintained include grab bars, faucet and door hardware, amenities such as toilet paper and paper towel dispensers, handicap parking signs and paint, concrete and asphalt.

19.   Defendant offered no testimony to contradict that such conditions tend to break down due to wear and tear and must be maintained. Nor did Defendant rebut the

8

fact that it had used the first handicap parking space for storage of a dumpster and heavy equipment. Nor did Defendant challenge the fact that it used the newly installed handicap parking space for storage of furniture. Defendant did not challenge that a mop bucket and trash can obstructed the required maneuvering spaces in the restroom, or that it had unsecured floor mats in the restroom and store entrance. It did not rebut the findings of any of the violations identified by either the Plaintiff or Mr. Herrera.

20.     In defense, Defendant makes only two points.

21.     First, Defendant claims to have fixed all these violations. In this regard, Defendant submitted the testimony of its owner, Walid Alsheikh. Mr. Alsheikh has a Bachelors in Enginering. However, Mr. Alsheikh is not a general contractor and has no special expertise or knowledge of the ADA or its specifications.  He testified that, in most instances, he performed the remediation work himself.

22.     Second, Defendant submitted the testimony of two contractors, who provided estimates that widening the restroom would cost upwards of eighty thousand dollars.

23.     Defendant submitted no evidence of making  restroom facilities available to disabled persons through alternate means.

## CONCLUSIONS OF LAW

The issues presented to this Court are (1) whether Plaintiff has standing to sue; (2) whether Defendant discriminated against Plaintiff on the basis of her disability; and (3) whether

Defendant has successfully divested this Court of jurisdiction by making alterations to the subject property pursuant to the mootness doctrine.

### Plaintiff Has Standing

To satisfy Article III standing requirements, a plaintiff must demonstrate (1) an injury in fact; (2) a causal relationship between the injury and conduct complained of; and (3) that it is likely that the injury will be redressed by a favorable court ruling.  Lujan v. Defenders of Wildlife, 504 U.S. 55 (1992).  A disabled person who suffers Title III ADA discrimination does not necessary have recourse to the law and is not always entitled to sue in court. To the contrary, many courts have declined to confer standing to a disabled person who suffered discrimination at a place of public accommodation.  In this regard, they consider four factors: (1) the proximity of the defendant's business to the plaintiff's residence; (2) the plaintiff's past patronage of the defendant's business; (3) the definiteness of the plaintiff's plan to return; and (4) the frequency of the plaintiff's travel near the defendant's business. (Hereinafter "Proximity Test".) These factors are not exclusive and no single factor is dispositive.[1]   Plaintiff testified that she travels throughout the State of Florida constantly, several times each month, and has done so for a number of years. This includes travel to and through Palm Beach County dozens of times in recent months.  Moreover, Plaintiff has already returned to the property. Defendant's facility is a gas station and convenience store located on a main thoroughfare near both I-95 and the Florida Turnpike.  As such, it derives revenue from customers traveling from other counties and states.

---

[1]This test is referenced by the Eleventh Circuit in Houston v. Marod Supermarkets, Inc, 733 F.3d 1323, 1327 (11th Cir. 2013). While the Circuit Court discussed this test as applied to the plaintiff, it did not affirmative employ the test to deprive the plaintiff of standing. Therefore, reference to the test was purely dicta.

This sort of facility does not lend itself to customers circling a date on the calendar when they intend to purchase gas or a candy bar, but is instead subject to spur of the moment decisions by passers by.  Therefore, it is not necessary, or even practicable, for Plaintiff to testify as to a specific date on which she intends to return to the subject property. Norkunas v. Seahorse, 3:09-cv-934, at DE 28, p. 10 (M.D. Fla. 6/16/2010); Access For The Disabled, Inc. v. Square LLC, 2007 U.S. Dist. LEXIS 99118 (M.D. Fla. 2007).

Plaintiff alleged in the complaint that she intended to return to the property in the near future. In fact, Plaintiff did indeed return to this property on July 18. On this point, the Eleventh Circuit opined:

> "As this Court stated in Shotz [v. Cates, 256 F.3d 1077 (11th Cir. 2001)], a plaintiff seeking an injunction under Title III **either** must "have attempted to return" to the non-compliant building **or** at least "intend to do so in the future". [Emphasis added.]

Houston v. Marod Supermarkets, 733 F.3d 1323, 1336 (11th Cir. ). In other words, the Eleventh Circuit held that an ADA plaintiff can satisfy the return requirement by **"either"** of two ways: (1) intend to return in the near future, **"or"** (2) have already returned. See also Payne v. Boston Market Corp., E.D. N.C. 5:12-cv-354, DE 16 (3/12/13)(holding that plaintiff established standing by returning to the property after suit was filed).  Likewise, in Sheely v. MRI Radiology Network, Inc., 505 F.3d 1173, 1189 (11th. Cir. 2007), the defendant argued that the plaintiff lacked standing because she had visited the property only once when the incident giving rise to the cause of action arose. The Eleventh Circuit held that the plaintiff had standing, basing its decision at least in part on the fact that the plaintiff had visited the facility subsequently in the

period prior to giving her deposition testimony. This included time subsequent to the filing of the complaint.

Thus, Plaintiff's frequency of travel through the area, her stated intent to return in the near future, and with the fact that she did recently return to the property, satisfies the Proximity Test and establishes standing.

Plaintiff's motive in visiting the property and returning to the property subsequently and in the future are completely irrelevant. Marod, 733 F.3d at 1333, 1336. Indeed, under Marod, Title III ADA testers have standing and visiting a property in the capacity as a tester is, by itself, a legitimate reason.  Indeed, the gravamen of Marod is that the plaintiff need no reason at all to visit a place of public accommodation. All that is relevant is whether he or she suffered discrimination.

Nor does the number of prior lawsuits filed by the plaintiff make any difference.  Marod, 733 F.3d at 1326 n. 2.  In that regard, the Eleventh Circuit stated: "It is not unprecedented in this country for advocacy groups and individual members of advocacy groups to find it necessary  to file a long trail of lawsuits in federal courts to enforce legal and civil rights". Marod, 733 F.3d at 1326. The "serial litigant" argument has been widely rejected. In Antoninetti v. Chipotle Mexican Grill, Inc., 614 F.3d 971 (9th Cir. 2010), cert denied, 2011 WL 645276 (79 USLW 3514, April 18, 2011) the Ninth Circuit held that a disabled plaintiff's history of prior litigation cannot be considered against him. In Antoninetti, it was found that the plaintiff had filed 20 prior actions and never returned to any of the prior establishments after settlement was reached. Nonetheless, the court held:

> Courts must tread carefully before construing a Disability Act plaintiff's history of litigation against him. As we have noted more than once, "[f]or the [Disabilities Act] to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the [Disabilities Act]." [Citations omitted].We must therefore be particularly cautious regarding credibility determinations that rely on a plaintiff's past [Disabilities Act] litigation.

614 F.3d at 980.  In Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1069 (9th Cir. 2008)(J. Gould,

Concurring), it was stated:

> Similarly, we accord standing to individuals who sue defendants that fail to provide access to the disabled in public accommodation as required by the Americans with Disabilities Act ("ADA"), even if we suspect that such plaintiffs are hunting for violations just to file lawsuits. See Molski v. Evergreen Dynasty Corp., 500 F.3d 1047, 1061-62 (9th Cir. 2007)("For the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA.").

From the Supreme Court on down, it is widely held that such fee-shifting provisions in a

civil rights statute evince a clear mandate from Congress to encourage "private attorneys general"

to actively enforce the statutes provisions.  See  Hensley v. Eckerhart, 461 U.S. 424, 445 (1983)

("All of these civil rights laws depend heavily upon private enforcement, and fee awards have

proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate

the important Congressional policies which these laws contain.");  Alliance For ADA

Compliance, Inc. v. Har-Gon Enterprises, Inc., No. 99-11703, slip op. at 3 (11th Cir. 2000) ("The

enforcement of civil rights statutes by plaintiffs as private attorneys general is an important part

of the underlying policy behind the [ADA]"); Bruce v. City of Gainesville, 177 F.3d 949, 952

(11th Cir. 1999); Mallory v. Harkness, 923 F.Supp 1546, 1551 (S.D. Fla. 1996) (Congress

intended Section 1988 to prompt plaintiffs to act as citizen enforcers).

"Civil rights law depends heavily on private enforcement. Moreover, the inclusion of penalties and damages is the driving force that facilitates voluntary compliance with the ADA." Parr v. L & L Drive-Inn Property, 96 F.Supp.2d 1065, 1082 (D. Hawaii 2000). One court decision the Middle District of Florida stated: "[t]he long and short of this conclusion is that businesses do not regularly comply with the ADA."   A. Joseph Raetano v. Kally K's Inc. M.D. Fla. 8:08-cv-02104 (March 12, 2009).  In the instant matter, "Defendant's station is wholly due to non-compliance with the statute." Id..   It is Defendant, not Plaintiff, who is to blame for the instant lawsuit, because its facilities are badly non-compliant.

For the foregoing reasons, Plaintiff has standing.

<u>The Proximity Test Is Inconsistent With The Constitution</u>

As noted above, a disabled person who suffers discrimination at a place of public accommodation does not automatically have the right to sue, and such persons are frequently denied standing by various courts applying the Proximity Test.      Although the ADA was intended to create a right equal to other civil rights, it is perhaps the only federal law a citizen actually forfeits when he or she travels a given distance from his or her home. In other legal contexts, it was recognized that  "[o]nly the strangest of circumstances would suggest that a violation of the Constitution would not be subject to equitable relief." California Profile Council v. Scully, 989 F.Supp 1282, 2301 (E.D.Cal. 1998).  It appears that Title III discrimination presents ample examples of those "strangest circumstances" where aggrieved individuals are deprived of recourse to the law.

As the Proximity Test is applied, disabled persons forfeit their civil rights every time they travel more than a few miles from their home. Thus, more than 99% of this country is blacked

14

out to them as far as their civil rights are concerned. Conversely, even though this Defendant operates a gas station and convenience store near two major routes of interstate travel, it is free to discriminate against any and all disabled persons except for those scant few who live in the neighborhood. Thus, Defendant may freely discriminate against more than 99% of the disabled population without consequence. Research has failed to discover any other federal statute that has been interpreted so absurdly.

The Proximity Test is inconsistent with  the rights of disabled persons to travel. Freedom of movement generally is associated with the fundamental right to travel. Gary v. City of Warner Robins, GA, 311 F.3d 1334, 1338 (11th Cir. 2002).  "The right to travel is part of the 'liberty' of which the citizen cannot be deprived without the due process of law...Freedom of movement across frontiers in either direction, and inside frontiers as well, was part of our heritage." Kent v. Dulles, 357 U.S. 116, 125-27 (1958).  The right of interstate travel includes protection against (1) "the erection of actual barriers to interstate movement"; and (2) "being treated differently from intrastate travelers".  Town of West Hartford v. Operation Rescue, 991 F.2d 1039, 1047 (2nd Cir. 1993).  "The constitutional right to interstate travel is virtually unqualified." Haig v. Agee, 453 U.S. 116, 125 (1958).  A citizen's right to travel freely among the 50 states is a "fundamental right".  Shapiro v. Thompson, 394 U.S. 618, 629 (1969).  Any classification affecting a fundamental right, such as the right to interstate travel,  is unconstitutional. Buchwald v. University Of New Mexico School of Medicine, 159 F.3d 487, 497 (10th Cir. 1998).  "A state law implicates the right to travel...when it uses any classification which serves to penalize the exercise of that right." Id. (distinctions that result in unequal distribution of rights between migrants and residents subject to most exacting scrutiny).  As applied, the Proximity Test is

exactly the sort of classification which courts abhor.  A disabled person's civil rights diminish with every mile of distance he travels from his own home and vanish completely when he or she crosses a vague line determined by a district court.

The Proximity Test also inconsistent with the Commerce Clause. Congress' Constitutional authority to enact the ADA flows from the Commerce Clause.  See 42 U.S.C. Section 12101(b)(4).  Article I, Section 8 of the Constitution grants Congress the power to "regulate Commerce...among the several States" and to enact all laws necessary and proper to this end.  U.S. Const., Art. I, Section 8, cls. 3, 18; Katzenbach v. McClung, 379 U.S. 294, 301-02 (1964).   On the other hand, activities that are purely *intrastate* are beyond Congress' reach.  Id., at 302. Application of the Proximity Test to deny this civil right to a disabled person who travels several hundred miles, let alone who crosses a state line, is fundamentally inconsistent with the Constitutional requirement that the law impact interstate commerce.  Indeed, if this law applies strictly to local travel, then Congress lacked the Constitutional power to enact it.

Therefore, the Proximity Test is inconsistent with a disabled person's Constitutional rights.

<u>The Proximity Test Applies An Overly Narrow Definition Of Injury</u>

The Proximity Test is also inconsistent with the language of the ADA itself and applies an overly narrow interpretation. This was addressed by the court in Betancourt v. Ingram Park Mall, 735 F.Supp.2d 587, 605 (W.D. Tx. 2010). In Ingram Park Mall, the court held that the injury described by the statute is not limited strictly to the disabled person's actual *encounter* with specific ADA barriers.  It is, in fact, far broader.   The court referenced numerous passages from the Statute itself which contemplated a broader injury. This includes denial of the

16

"*opportunity*" to the disabled individual to participate or benefit from a good, service, privilege, advantage or accommodation that is not equal to that afforded to other individuals. 42 U.S.C. Section 12182(b)(1)(A)(ii) likewise additionally proscribes the affording of the "*opportunity*" to disabled individuals to participate in or benefit from a good, service, facility, etc. that is not equal to that afforded other individuals.  Several other references in the ADA demonstrate Congress' intent not just to equalize actual "participation" for disabled persons, but also the "opportunity" to participate.  In the Findings and purpose, Congress explained:

> "the Nation's proper goals regarding individuals with disabilities are to assure equality of *opportunity*, full participation, independent living and economic self-sufficiency for such individuals[.]"

42 U.S.C. Section 12101(a)(8)(emphasis added).

A disabled plaintiff who encounters discriminatory violations which continue, is being deprived the "*opportunity*" to participate or benefit in the goods and services, etc, which is expressly listed as a violation under 42 U.S.C. Section 12182(b)(1)(A)(i) and (ii).  Under 42 U.S.C. Section 12182(b)(1)(A)(i) and (ii), the plaintiff's civil rights are *presently and continuously* being violated because he is deprived the *opportunity* of visiting the premises free of discrimination.

The enforcement provision of the ADA supports this analysis.  In relevant part, the section provides: "Nothing in this section shall require a person with a disability to engage in a *futile gesture* if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. Section 12188(a)(1) (emphasis added).

17

This language obviates the requirement that a court determine whether a disabled plaintiff will again be injured in the future. Rather, because the plaintiff is deprived of equal opportunity, the injury is *ongoing and continuous* as long as the discriminatory barriers remain in place. Ingram Park Mall, 735 F.Supp.2d at 602.

Some courts have reasoned that the "futile gesture" provision addresses and satisfies the "imminent threat of future injury" element for injunctive relief. Others have held that this provision satisfies the actual, present and ongoing injury element. For example, in Pickern v. Holiday Quality Foods, 293 F.3d 1133, 1138 (9th Cir. 2002), the Ninth Circuit held that a plaintiff's injury "*continues*" "so long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred..." See also Clark v. McDonalds Corp., 213 F.R.D. 198, 229 (D.N.J. 2003)(knowledge of the continuing barriers constitutes an actual and existing injury); Ingram Park Mall, 735 F.Supp.2d at 602 ("The fact that the disabled person is being deterred from visiting an establishment they would otherwise visit, even if infrequently, is an ongoing, present injury").

If the Proximity Test is applied as Defendant would have it, Plaintiff is deprived the opportunity to get gas or stop at a convenience store in West Palm Beach, only one county away from her home. This would effectively deprive her of the right to travel to all points north of her home. This overly narrow interpretation of the law is inconsistent with Plaintiff's constitutional and statutory rights.

<u>Segregation Is An Additional Injury</u>

The ADA establishes another injury in fact, namely, the *segregation* of the disabled community. The language of the statute clearly shows Congressional intent to end this

segregation.  42 U.S.C. Section 12101(a) sets forth Congress' finding that disabled persons are

"precluded" from full participation in society.  Further, "society has tended to isolate and

segregate" disabled persons. Disabled persons "occupy an inferior status in our society'.  At 42

U.S.C. Section 12182(b)(1)(A)(iii), the Act prohibits "Separate benefit[s]" to disabled persons.

At 42 U.S.C. Section 12182(b)(1)(B), the Act mandates "Integrated settings".  At subsection 42

U.S.C. Section 12182(b)(1)(C), the Act further states that "an individual with a disability shall

not be denied the opportunity to participate in such programs or activities that are not separate or

different."  At 42 U.S.C. Section 12182(b)(2)(iii), the Act defines discrimination as "a failure to

take such steps as may be necessary to ensure that no individual with a disability is

...segregated..."

Segregation of one community from another is recognized as an actionable injury even

where the individual plaintiff did not personally encounter segregating barriers.  See Fair

Housing In Huntington Committee v. Town of Huntington, 316 F.3d 357 (2nd Cir. 2003)

(although plaintiffs did not visit the facility, they had the right to live in integrated community);

Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 208 (1972)(right to live in integrated

community is actionable).

Several courts have specifically recognized that *segregation* is a cognizable injury under

the ADA. Helen v. DiDario, 46 F.3d 325, 333 n. 25 (1995); Chaffin v. Kansas State Fair Board,

348 F.3d 850, 858 (2003)(noting that Congress specifically identified "**segregation**" as a form of

prohibited discrimination); Mark H. v. Lemahieu, 513 F.3d 922 (9th Cir. 2008)(recognizing that

the ADA prohibits **segregation** of disabled students in schools); Fisher v. Oklahoma Health Care

Authority, 335 F.3d 1175 (10th Cir. 2003)(**segregation** of disabled individuals in institutions is prohibited by ADA).

<u>The Proximity Test Contradicts The Mandatory Language Of The Statute</u>

The Proximity Test is also inconsistent with the statutory language granting rights and relief as being mandatory, rather than discretionary.

First, the language of 42 U.S.C. Section 12182(a) is clear by stating that "**no** individual shall be discriminated against...by **any** person..." (Emphasis added.)

With respect to remedies, 42 U.S.C. Section 12188 provides:

> The remedies and procedures set forth in section 2000a–3(a) of this title are the remedies and procedures this subchapter provides to **any** person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title. Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.
>
> (2) Injunctive relief
> In the case of violations of sections 12182(b)(2)(A)(iv) and section 12183(a) of this title, injunctive relief **shall** include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this subchapter. Where appropriate, injunctive relief **shall** also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter. (Emphasis added.)

42 U.S.C. Section 2000a-3(a) provides, in relevant part:

Whenever **any** person has engaged or there are reasonable grounds to believe that **any** person is about to engage in any act or practice prohibited by section 2000a–2 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, **may be instituted by the person aggrieved....** (Emphasis added.)

There is nothing in this language that lends any support for any elements of the Proximity Test. Rather, it applies to **all** defendants engaging in discrimination and **all** persons who suffer it. It even applies to **all** persons who have "reasonable grounds for believing" that they are about to suffer discrimination for discriminatory conditions of new construction.  This "about to be subjected to discrimination" is only stated with respect to violations involving new construction, in violation of Section 12183.  No such qualification or reference to imminence is found in the language of Section 12182. Rather, rights under that section are bestowed on "any" disabled person who suffers discrimination by "any" person who owns, operates, leases to or leases from a place of public accommodation. There is no limitation in this language that supports application of the Proximity Test to deprive an entire class of aggrieved disabled persons or exempt an entire class of violators.

Second, the language bestowing the right to injunctive relief is mandatory, rather than discretionary. The instant action involves discrimination in violation of Section 12182(b)(2(A)(iv)(removal of barriers in pre-existing facility), as well as the failure of policy and the provision of alternate methods.  On these issues, the statute unequivocally makes injunctive relief mandatory, by the use of the word "shall". 42 U.S.C. Section 12188(a)(2).

For the foregoing reasons, the statute clearly makes injunctive relief available to "any" person aggrieved as the result of violations by "any" person and the right to such relief is mandatory. "No individual" shall suffer discrimination. There is simply no language in the Statute which allows a court to deprive an entire class of  disabled victims of recourse to the law or exempt an entire class of violators.

For the foregoing reasons, application of the Proximity Test is inappropriate as inconsistent with Plaintiff's statutory and Constitutional rights.

<u>Defendant Engaged In Discrimination</u>

The next issue before the Court is whether the conditions encountered by Ms. Kennedy constituted "discrimination" as that term is defined by the ADA.

Section 12182(a) of the ADA states:

> "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), operates a place of public accommodation."

42 U.S.C Section 12182(a).

Prohibited discriminatory practices are described under several sections. These include removal of architectural barriers, failure of policy, practice and procedure, failure to provide equal and full access and failure to maintain.

<u>Architectural Barriers</u>

With respect to facilities that existed prior to the effective date of the ADA, discrimination includes: "a failure to remove architectural barriers, ... in existing facilities[2], .... where such removal is readily achievable[.]" 42 U.S.C. Section 12182(b)(2)(A)(iv).

A barrier has been defined as a feature that fails to comply with the applicable ADAAG. <u>Chapman v. Pier I Imports, Inc.</u>, 631 F.3d 939, 948 n.5 (9th Cir. 2011). It is not necessary that a barrier fully prevent a disabled person from gaining access to an element or the premises. Rather, it is sufficient that the barrier interfere with the plaintiff's "full and equal enjoyment" of

---

[2]The subject facility was constructed prior to the ADA and therefore constitutes an "existing facilit[y]".

22

the facility.  Chapman, 631 F.3d at 947.  See also Boemio v. Love's Restaurant, 954 F.Supp. 204, 208 (S.D.Cal.1997) ("while the defense offers that with additional time, patience, and jockeying of the wheelchair, access could have been achieved, this was not reasonable nor consistent with the public policy of interest in providing physically handicapped persons with equal access to public facilities ... the standard cannot be 'is access achievable in some manner.' We must focus on the equality of access."). Clavo v. Zarrabian, 2004 WL 3709049 (C.D. Cal. 2004).

The next issue is whether those barriers were "discriminatory" within the meaning of 42 U.S.C. Section 12182(b)(2)(A)(iv).  Therefore, this Court must determine whether their removal was "readily achievable".  Here, a plaintiff bears the initial burden of suggesting a method of removal of a barrier is readily achievable.  The burden then shifts to the defendant to show that the suggested method cannot be accomplished without much difficulty or expense. Gathright-Dietrick v. Atlanta Landmarks, Inc., 452 F.3d 1269, 1273 (11th Cir. 2006). The ample reasons for this burden ultimately resting on the defendant are explained in Colo. Cross Disability Coalition v. Hermanson Family Ltd. Pshp., 264 F.3d 999, 1005-06 (10th Cir. 2001) and  Roberts v. Royal Atlantic Corporation, et al., 542 F.3d 363, 371 (2d Cir. 2008). In Roberts, the Second Circuit explained:

> "...[P]laintiff's burden does not require him or her to furnish exact or highly detailed cost estimates.  Because defendants possess superior access to information regarding their own facilities, such as architectural plans, maintenance requirements and history, and the historical and projected costs of repairs and improvements, they are typically in a position far more easily to refute a plaintiff's proposal as unreasonable than is a plaintiff to prove otherwise.".

The Act sets forth several criteria in determining whether removal of a particular barrier is "readily achievable".  These include: "(A) the nature and cost of the action; (B) the overall

financial resources of the facility or facilities involved in the action; the number of persons

employed at such facility; the effect on expenses and resources, or the impact otherwise of such

action upon the operation of the facility; ( C) the overall financial resources of the covered entity;

the overall size of the business of a covered entity with respect to the number of its employees;

the number, type, and location of its facilities; and (D) the type of operation or operations of the

covered entity, including the composition, structure, and functions of the workforce of such

entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities

in question to the covered entity."   42 U.S.C. Section 12181(9).  The vast majority of this

information is under the exclusive control of defendants.

In Atlanta Landmarks, the Eleventh Circuit ruled that a Title III ADA plaintiff must

present sufficient evidence *so that a defendant can evaluate* the proposed solution to an alleged

architectural barrier, the difficulty of accomplishing it, the cost implementation, and the

economic operation of the facility.  In Roberts, 542 F.3d at 373,  the Second Circuit explained:

"When evaluating a claim under this provision, we require a plaintiff to articulate a plausible

proposal for barrier removal, "the costs of which, facially, do not clearly exceed its benefits." In

Access for Disabled, Inc. v. Caplan, case number 01-7310-CIV-Jordan (SD Fla. 2002), the

Southern District of Florida described what the plaintiff's expert must do to meet plaintiff's

burden..  The Court stated:

> "the Plaintiffs have met their initial burden of showing that their proposed barrier
> removals are readily achievable.  They submitted an expert's report detailing the
> violations at the Central Medical Plaza.  For each violation listed, the report
> contains specific recommendations for removal, outlining the method and cost of
> implementation.  For example, after noting that there is no accessible route from
> the street or the public sidewalk, the report states that "(t)he cost to remove the
> barrier identifying in paragraph 1, by installing a concrete path at the planter,

24

which is 5' wide, and to add strapping to the building, is $500.00, (affidavit of Thomas Ricci at 4)...The Plaintiffs, for each violation, have provided a specific plan which is readily achievable, and a precise cost estimate.  They, therefore, have satisfied their initial burden."  Page 7.

Kennedy and Herrera[3] testified as to the presence of numerous architectural barriers. These primarily included a slew of inaccessible features inside the restroom, improper signage and paint in the handicap parking spaces, and the unsecured floor mats in the restroom and store entrance.  Mr. Herrera identified each of these barriers, cited the applicable ADA standards violated[4], suggested a remedial measure, and provided a cost estimate.

_____

[3]Defendant challenges that Mr. Herrera's report was the result of an unnoticed site inspection. However, this formality is not required. Various courts have held that places of public accommodation are open to the public, including a plaintiff's expert.  Therefore, the expert has the right to visit all public areas and may conduct an inspection without any need to serve a formal Rule 34 notice.   See Doran v. 7-Eleven, Corp., 524 F.3d 1034, 1039 n.2(9th Cir. 2007); Moeller v. Taco Bell Corp., 2009 WL 3066658 *2 (N.D. Cal. 2009); Grabau v. Target Corp., 2008 WL 616068 *3 ( D. Colo. 2008); MONY Life Ins. Co. v. Hinsdale Mgmt, 2002 WL 1285076 *3 (N.D. Ill.2002); Houston v. Southern Management Corporation, 2:13-cv-00164-SPC-UAM DE 35, (M.D. Fla. 09/13/13)(declining to strike report based on unnoticed site inspection).

[4]The Standards are the ADA Architectural Guidelines ("ADAAGs") and the 2010 ADA Standards For Accessible Design ("2010 ADA Standards"). The 2010 ADA Standards replaced the ADAAGs in 2012.  With minor differences, the two standards are substantially similar and as they apply to the conditions at issue herein. Applying these standards, conditions that have not been altered since the enactment of the ADA were required to comply with the ADAAG until March 15, 2012 and with the 2010 ADA Standards thereafter. Any alterations made prior to the effective date of the 2010 ADA Standards must have complied with the ADAAGS. Any alterations made after March 15, 2012 must comply with the 2010 ADA Standards. Any alterations made between those two dates must comply with either standard.   All modifications and barrier removal measures made by Defendant during the course of this litigation are governed by the 2010 ADA Standards.  Also, with respect to the new conditions created by Defendant's new construction and alterations, the "readily achievable" barrier removal standards no longer apply. 28 C.F.R. Part 36.304(d) provides that barrier removal measures shall comply with the requirements applicable to alterations under parts 36.402 and 36.404 through 36.306. 28 C.F.R. Part 36.306 provides that alterations must comply with either the ADAAGs or 2010 ADA Stds., depending on the date the alteration was implemented. In other words, all remedial

Significantly, a considerable portion of the barriers identified by Plaintiff and expert required marginal expenditure and are specifically listed as being readily achievable by the regulations themselves. These included the installation of grab bars, relocation of amenities, making the disabled parking spaces compliant, installation of compliant ramps, moving of obstructions. At 28 CFR 36.304, the Department Of Justice provides a non-exclusive list of barriers to be removed.

> (1) Installing ramps; (2) Making curb cuts in sidewalks and entrances; (3) Repositioning shelves; (4) Rearranging tables, chairs, vending machines, display racks, and other furniture; (8) Widening doors; (9) Installing offset hinges to widen doorways; (11) Installing accessible door hardware; (12) Installing grab bars in toilet stalls; (13) Rearranging toilet partitions to increase maneuvering space; (14) Insulating lavatory pipes under sinks to prevent burns; (15) Installing a raised toilet seat; (16) Installing a full-length bathroom mirror; (17) Repositioning the paper towel dispenser in a bathroom; (18) Creating designated accessible parking spaces.

This regulation further sets forth priorities for barrier removal:

> "A public accommodation is urged to take measures to comply with the barrier removal requirements of this section in accordance with the following order of priorities.
> (1) First, a public accommodation should take measures to provide access to a place of public accommodation from public sidewalks, parking, or public transportation. These measures include, for example, installing an entrance ramp, widening entrances, and providing accessible parking spaces.
> (2) Second, a public accommodation should take measures to provide access to those areas of a place of public accommodation where goods and services are made available to the public. These measures include, for example, adjusting the layout of display racks, rearranging tables, ... widening doors, ...  and installing ramps.
> (3) Third, a public accommodation should take measures to provide access to restroom facilities. These measures include, for example, removal of obstructing furniture or vending machines, widening of doors, installation of ramps, providing accessible signage, widening of toilet stalls, and installation of grab bars.

---

measures undertaken by Defendant must comply with the 2010 ADA Standards.

> (4) Fourth, a public accommodation should take any other measures necessary to
> provide access to the goods, services, facilities, privileges, advantages, or
> accommodations of a place of public accommodation.

28 CFR 36.304( c).  The Department of Justice, charged with promulgating the regulations,

published the Technical Assistance Manual which provides, at Section III-4.4400, that the

obligation to engage in readily achievable barrier removal is a continuing one.  Over time, barrier

removal that initially was not readily achievable may later be required because of changed

circumstances.

In the instant matter, Plaintiff's expert detailed each and every violation. His reports forth

detailed and specific remediations, as well as costs. Therefore, Plaintiff met his burden.

The burden then shifting, the question is whether the Defendant has proven that removal

of the barriers was not readily achievable.  With respect to all but one item, Defendant did not

raise any challenge on this issue. Rather, Defendant claims that it fixed the violations in response

to the lawsuit. Thus, Defendant concedes that removal of nearly all of the barriers was "readily

achievable" and that failure to do so in the 27 years since the ADA's enactment was

discriminatory.

Defendant only challenges whether widening the restroom was readily achievable. In this

regard, Defendant submitted the testimony of two contractors who stated that this would cost as

much as $80,000.00. However, this alone does not satisfy Defendant's burden. Rather, the statute

imposes an additional burden.

With respect to defendants who prove that a remediation is not readily achievable, 42

U.S.C. Section 12182(b)(2)(A)(v) imposes an additional burden that the defendant must meet.

Under this additional burden, "discrimination" is also defined as follows:

where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

Thus, even assuming that the Defendant met its burden of demonstrating that making the restroom accessible to wheelchair users was not readily achievable, it provided no evidence of any alternative means for disabled persons to use a restroom. Thus, even if Defendant met its burden under Subsection (iv)(barrier removal being not readily achievable), it fails to satisfy the additional requirement under Subsection (v)(alternative method). As it stands, a person in a wheelchair simply cannot use the restroom and Defendant offers no alternative.

Thus, Plaintiff has satisfied her burden of proving that there were discriminatory barriers to access, the removal of which was readily achievable and Defendant has not satisfied its burden of rebutting the same.

Defendant's Obstructions, Movable Objects, Failure Of Policy And Failure To Maintain

Plaintiff encountered other forms of discrimination at Defendant's property that fall outside 42 U.S.C. Section 12182(b)(2)(A)(iv). Indeed, this Subsection is but one of many provisions defining discrimination. Other forms of discrimination prohibited by the statute include non-architectural barriers, which encompass failure to maintain features required to be accessible and allowing required maneuvering spaces to become obstructed.

28 C.F.R. 36.211 (a) states: "A public accommodation shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part."

28

First, the defendant's failure to maintain its original handicap parking space parking space is a violation of this regulation. In this respect, Defendant had allowed the paint to fade so badly that it became nearly unnoticeable.

Second, Defendant allowed the handicap parking space to be used for storage of the dumpster and heavy equipment, rendering it completely unusable to the disabled. Likewise, the defendant's use of the restroom for storage of a mop bucket, thus obstructing the required maneuvering spaces, constitutes a failure to maintain. So too did the placement of a trash can obstruction constitute a failure to maintain required accessible features. Even after being sued and relocating the handicap parking space in response to this suit, Defendant allowed the new space to be used for furniture storage, thus completely obstructing the space and preventing use by disabled persons. This last violation was observed by Mr. Herrera on June 6 and again by Plaintiff on July 18, 52 days afterward. This demonstrates a flagrant disregard by Defendant of its obligation to maintain its accessible features.

Additionally, allowing the restroom's required maneuvering spaces to be obstructed with a mop bucket and trash can are further examples of the Defendant's failure to maintain features required to remain accessible.

Allowing the paint to fade and allowing required accessible features to become blocked with obstructions also violates 42 U.S.C Section 12182(b)(2)(A)(ii): which describes "discrimination" as including:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally

alter the nature of such goods, services, facilities, privileges, advantages, or accommodations[.]

Additionally, Subsection 12182(b)(2)(A)(iii) describes discrimination as:

a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden[.]

Under 42 U.S.C. Section 12182(a): discrimination includes deprivation in the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."

Even the barrier removal provision of Subsection 12182(b)(2)(A(iv) arguably applies to movable obstructions.  In 28 C.F.R. 36.304(b), the DOJ sets forth a number of examples it considers to be "barriers" which must be removed. These "include, but are not limited to... (3) Repositioning shelves; and (4) Rearranging tables, chairs, vending machines, display racks, and other furniture[.]" In 28 C.F.R. 36.304( c), the regulations set forth priorities for barrier removal. Here again, the regulations refer to: "adjusting the layout of display racks, rearranging tables" ... "removal of obstructing furniture or vending machines...". The regulations also provide a catch-all provision:

Fourth, a public accommodation should take any other measures necessary to provide access to the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation.

28 C.F.R. 36.304( c)(4).  Thus, the definition of "barriers" as set forth in the regulations includes movable obstructions.

Indeed, the various provisions of the standards contain numerous references indicating that the passage and maneuvering spaces be kept "clear".  These include 2010 ADA Stds. Chapters 304, 305, 306, 308, 309, 403, 404, 405, 406, 603, 604, 605, 606 and ADAAG 4.13, 4.2, 4.8, 4.13, 4.16, 4.17, 4.18  (governing the maneuvering spaces and pathways to all elements and throughout a facility are replete with references that they be "clear").

The ADAAGs contains a definitions section at Section 3.5 with several relevant provisions.

"Accessible Route" is defined as:

> "[a] continuous unobstructed path connecting all accessible elements and spaces of a building or facility. Interior accessible routes may include corridors, floors, ramps, elevators, lifts and clear floor space a fixtures. Exterior accessible routes may include parking access aisles, curb ramps, crosswalks and vehicular ways, walks ramps, and lifts."

"Clear" is defined as "Unobstructed."

"Clear Floor Space" is defined as "The minimum unobstructed floor or ground space required to accommodate a single, stationary wheelchair and occupant."

The 2010 ADA Standards to not include these terms in their definitions section.

However, the Standards provide, at Section 106.3:

> Undefined Terms: The meaning of terms not specifically defined in 106.5 or in regulations issued by the Department of Justice and the Department of Transportation to implement the Americans With Disabilities Act or in referenced standards shall be as defined by collegiate dictionaries in the sense that the context implies.

The Merriam-Webster's dictionary defines "clear" as "free from obstruction". The Free Dictionary defines "clear" as "free from impediment, obstruction, or hindrance; open."  A review

of any number of dictionaries reveals that are all in accord that "clear" means free from obstruction, impediment or hindrance.

Numerous authorities have held that movable obstructions and failure to maintain constitute actionable discrimination.

In Lieber v. Macy's West, Inc., 80 F.Supp.2d 1065 (N.D. Cal. 1999), it was recognized that moveable racks are covered by the ADA and cannot obstruct required pathways. In Watanabe v. Home Depot, Inc., 2003 U.S. Dist. Lexis 27012 (C.D. Cal. 2003), it was held that the defendant's practice of storing items in the disabled access aisles violated the ADA. In Clavo v. Zarrabian, 2004 U.S. Dist. LEXIS 29324, *9 (C.D. Cal. 2004), it was held that blocking access to an accessible feature violates the ADA. In Crandall v. Starbucks Corp., 2017 U.S. Dist Lexis 52156 (N.D. Cal. 2017), the court held that merchandise display obstructions violated the ADA. In Madden v. Del Taco, Inc., 150 Cal.App.4th 294, 58 Cal.Rptr.3d 313, 320 (2007), it was held that a restaurant's placement of a concrete trash container on entrance ramp, which "appear[ed] to be a result of the affirmative conduct of [defendant]," constituted a failure to maintain.

At least one Circuit Court has ruled that obstructions violate the ADA. See Chapman v. Pier 1 Imports (U.S.) Inc. (Chapman II), 779 F.3d 1001 (9th Cir. 2015).

In the case at bar, the placement of a dumpster, heavy equipment, trash can and mop bucket in the spaces required to be kept clear for disabled persons could hardly be the result of temporary obstructions resulting from careless customers. Rather, they were obviously placed there by employees at the facility. This is bolstered by the fact that the furniture was allowed to obstruct the new handicap parking space and remain in place for a period of at least 52 days.

<u>This Action Is Not Moot</u>

32

Defendant challenges only whether the widening of the restroom constitutes discrimination. It did not contradict that the other violations identified by Plaintiff and Mr. Herrera constituted discrimination. Instead, puts its entire defense strategy on the notion that it would fix the violations during the course of this prolonged litigation and that this case is therefore moot.  The purpose for this strategy is to deprive Plaintiff's attorneys compensation for their reasonable attorney fees, costs and litigation expenses. Defendant brazenly announced that it would pursue this strategy when it filed its Affirmative Defenses. The Answers, which were part of that same document, falsely denied the existence of those same violations. The result is that, rather than resolve at an early stage, this case has been vigorously litigated all the way to trial and the fees and costs have exploded exponentially.  As stated by Judge Cohn, this questionable strategy raises concern and undermines the spirit and purpose of the law and should not be condoned by courts.  See Payne v. Toys R Us-Delaware, Inc., 15-80487, DE 34, p. 3 (S.D. Fla. 12/23/2015).

The ADA, like other civil rights statutes, is a private attorneys general statute.  In its Findings and Purpose, Congress stated: "unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination[.]" 42 U.S.C. 12101(1)(4). Congress further stated: "is it the purpose of this chapter - "(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; [and] (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities[.]" 42 U.S.C. Section 12101(b).  Under the well settled rule of statutory construction, "[i]t is this

Court's responsibility to give effect to the legislative intent whenever that intent is manifested."

Ala. Educ. Ass'n v. State Superintendent of Educ., 746 F.3d 1135, 1146 (11th Cir. 2014).

The Supreme Court has held that a prevailing plaintiff in a civil rights action "should ordinarily recover an attorney's fee unless special circumstances would render an award unjust." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983).  See also Albemarle Paper Co. v. Moody, 422 U.S. 405, 415 (1975)(reasoning that the strong public interest in having injunctive actions brought in order to remedy civil rights violations can only be vindicated if successful plaintiffs, acting as "private attorneys general," are awarded attorneys' fees in all but very unusual circumstances); Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 413 (1978) (when a district court awards attorney fees to a civil rights plaintiff, it does so against a violator of the law); Alliance For ADA Compliance, Inc. v. Har-Gon Enterprises, Inc., No. 99-11703, slip op. at 3 (11th Cir. 2000)("The enforcement of civil rights statutes by Plaintiffs as private attorneys general is an important part of the underlying policy behind the [ADA]").  "All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain."  Hensley, 461 U.S. at 445. In Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 (1968), the Supreme Court explained the rationale for the award of attorney fees for plaintiffs acting as private attorneys general in the instance of racial discrimination.

> If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel

fees-not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II.

In <u>Young v. New Process Steel, LP</u>, 419 F.3d 1201, 1205 (11th Cir. 2005), the Eleventh Circuit said the following of Congress' inclusion of fee shifting provisions in civil rights statutes:

Reimbursing successful Plaintiffs for the cost of their attorneys out of the losing defendants' pockets serves a dual function: **it provides an incentive for bringing the lawsuits, and it adds to the costs of those who violate the civil rights of others.**

(Emphasis added.)

The presumptions of the law weigh heavily in favor of awarding plaintiffs their attorney fees, costs and litigation expenses with respect to civil rights actions brought against violators of the law. Without such awards, disabled persons could not afford representation, no attorney could afford to incur tens of thousands of dollars in out of pocket expenses and many hundreds of hours of their own time.

In the case at bar, Defendant's strategy necessarily required that Defendant falsely deny that it violated the ADA and litigate aggressively in order to avail itself of the delay to trial. While continuing to run up fees, Defendant utilized the continuing delay to fix the same violations it denied existed. Now, Defendant seeks to have this court validate its behavior by dismissing the action as moot.

First, to avail itself of this technicality, Defendant and its attorney have violated other rules. Fed. Civ. P. Rule 11(b)(3)  requires that a party must have knowledge, information or belief that her "factual contentions have evidentiary support or ... will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). Rule 11(c) provides that sanctions may be imposed on parties that violate Rule 11(b),

and that these sanctions may be requested via a motion[5] or ordered on the court's own initiative. Fed.R.Civ.P. 11( c).  Additionally, any attorney who multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to pay excess costs, expenses and attorneys' fees. 28 U.S.C. § 1927.  Cody v. Palmyra Park Hosp. Inc., 398 Fed.Appx. 556, 559 (11th Cir.2010).  The Statute permitting the imposition of sanctions against attorneys for vexatious and unreasonable multiplication of proceedings requires a court to find an attorney has (1) multiplied proceedings, (2) in an unreasonable and vexatious manner, (3) thereby increasing the cost of the proceedings, and (4) doing so in bad faith or by intentional misconduct.  In re Schaefer Salt Recovery, Inc., 542 F.3d 90, 100 (3rd Cir. 2008) The purpose is the deterrence of intentional and unnecessary delay in the proceedings. Id.

Numerous courts have held that a defendant may be sanctioned for filing an answer with meritless denials, or for vexatiously multiplying court proceedings.  Ruth v. Unifund CCR Partners, 604 F.3d 908, 911 (6th Cir.  2010)(The requirement [under Rule 11] that parties have a good-faith basis for their pleadings applies to answers every bit as much as it does to counterclaims.); Sherman v. Winco Fireworks, Inc., 532 F.3d 709, (8th Cir. 2008)(awarding sanctions where abusive defense multiplied proceedings vexatiously and unreasonably); MHC Inv. Co. v. Racom Corp., 323 F.3d 620, 627 (8th Cir. 2003)(meritless defense unsupported by fact or law asserted for purpose of delay sanctionable); Horst Masonry Const., Inc. v. ProControls

---

[5]The option of seeking rule 11 sanctions by motion was unavailable to the Plaintiff, as the rule first requires that the defendant be afforded 21 days notice before the motion is filed. This affords defendant the opportunity to withdraw its false defenses. This option was not available to Plaintiff until after Defendant had already asserted its claim of mootness, thus presenting a *fait accompli* to the Court whereby the denials set forth in the Answer and Affirmative defenses were already nullified.

Corp., 208 F.3d 218 (8th Cir. 2000)(assertion of meritless defense sanctionable); Bodenhamer Bldg. Corp. v. Architectural Research Corp., 989 F.2d 213, 217-18 (6th Cir. 1993)(sanctions proper against defendants who denied many allegations of complaint they knew to be true); Artco Corp. v. Lynnhaven Dry Storage Marina, Inc., 898 F.2d 953, 956 (4th Cir. 1990)(sanctions imposed for filing meritless denials); Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101 (Fed. Cir. 1986)(filing of unfounded defenses sanctionable); Williams v. R.W. Cannon, Inc., 2008 WL 4372894 (S.D.Fla.,2008)(sanctions warranted for filing of frivolous defenses where lawyers either knew or should have known after reasonable inquiry that denials were untrue - thus causing plaintiff additional litigation expenses); Lockheed Martin Energy Systems, Inc. v. Slavin, 190 F.R.D. 449 (E.D.Tenn.1999)(meritless answer sanctionable); Bellagio, LLC v. Horaney, 319 Fed.Appx. 652, 653-54 (9th Cir. 2009)(sanctions imposed for vexatiously and unreasonably multiplying proceedings in litigation by filing meritless defense in answer and opposition to motion for summary judgment and for acting for the sole purpose of delay).

Defendant and its attorneys prolonged this litigation only by denying the existence of discriminatory violations. In the meantime, they endeavored to hastily remedy those same violations.

<u>Defendant's Burden Of Proving Mootness Is Stringent</u>

According to the "general rule" a mootness defense should "rarely" succeed.  See Pleasureland Museum, Inc. v. Beutter, 288 F.3d 988, 998 (7th Cir. 2002)("The general rule is that voluntary cessation of a challenged practice rarely moots a federal case.");  See also City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n. 1 (2001)(same);  Friends of The Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189 (2000)( "a party should

37

not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable

behavior."); Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49,

66-67 (1987) ("Mootness doctrine ... protects plaintiffs from defendants who seek to evade

sanction by predictable 'protestations of repentance and reform.' ")(quoting United States v.

Oregon State Medical Soc., 343 U.S. 326, 333 (1952). Put another way, the standard for

determining whether a defendant's voluntary cessation of illegal behavior moots a case is

"stringent". Friends Of The Earth, 528 U.S. at 189.

 In Friends Of The Earth, the defendant had been sued for illegally releasing pollutants

into a nearby river from a specified industrial facility. The defendant had argued that the case

was moot because it was subsequently in substantial compliance with the law, and that the

facility at issue had closed, been dismantled and operations permanently ceased. In rejecting this

defense, the Court stated:

> It is well settled that a defendant's voluntary cessation of a challenged practice
> does not deprive a federal court of its power to determine the legality of the
> practice." City of Mesquite [ v. Aladdin's Castle, 455 U.S. 283, 289 (1982)]. "If it
> did, the courts would be compelled to leave 'the defendant . . . free to return to his
> old ways.'" 455 U.S. at 289, n. 10 (citing United States v. W. T. Grant Co., 345
> U.S. 629, 632 [] (1953)). In accordance with this principle, the standard we have
> announced for determining whether a case has been mooted by the defendant's
> voluntary conduct is stringent: "A case might become moot if subsequent events
> made it absolutely clear that the allegedly wrongful behavior could not reasonably
> be expected to recur." United States v. Concentrated Phosphate Export Assn., Inc.,
> 393 U.S. 199, 203 [] (1968). The "heavy burden of persuading" the court that the
> challenged conduct cannot reasonably be expected to start up again lies with the
> party asserting mootness.

528 U.S. at 189. See also Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000).

 To succeed in a mootness defense, it is the Defendant's "formidable burden" to prove the

challenged conduct cannot reasonably be anticipated to recur. Friends Of The Earth, 528 U.S. at

190. In <u>Sheely v. MRI Radiology Network, P.A.</u>, 505 F.3d 1173, 1183-84 (11ᵗʰ Cir. 2007), the

Eleventh Circuit held that:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways. In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.

> The Eleventh Circuit stated a three pronged test that the defendant must prove:

> (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability. (Emphasis added.)

It is well settled that the mootness defense is unavailable to an opportunistic defendant

who repents in response to a lawsuit simply to divest the court of jurisdiction. <u>Athiests of Florida,</u>

<u>Inc. v. City of Lakeland, Florida</u>, 713 F.3d 577, 594 (11ᵗʰ Cir. 2013).[6]    In <u>Sheely</u>, 505 F.3d at

1186, the Eleventh Circuit stated: "It is the duty of the courts to beware of efforts to defeat

injunctive relief by protestations of repentance and reform, especially when abandonment seems

---

[6]See also <u>City of Mesquite v. Aladdin's Castle, Inc.</u>, 455 U.S. 283, 289 (1982). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." <u>Id</u>.   See also <u>Yunker v. Allianceone Receivables Management, Inc.</u>, 701 F.3d 369, 372-73 (11ᵗʰ Cir.  2012);  <u>National Ass'n of Boards of Pharmacy v. Board of Regents of the National Ass'n of Boards of Pharmacy v. Board of Regents of the University System of Georgia</u>, 633 F.3d 1297, 1310 (11ᵗʰ Cir 2011); <u>Military Order of the Purple Heart v. Sec'y of Veterans Affairs</u>, 580 F.3d 1293, 1295 (Fed.Cir.2009).  As the Supreme Court has noted, "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." <u>United States v. Oregon State Medical Society</u>, 343 U.S. 326, 333 (1952), quoted in <u>W.T. Grant</u>,  345 U.S. at 632; <u>Secretary of Labor v. Burger King Corp.</u>, 955 F.2d 681, 684 (11ᵗʰ Cir. 1992).

timed to anticipate suit ."  See also <u>Coral Springs St. Sys., Inc. v. City of Sunrise</u>, 371 F.3d 1320, 1331-32 (11th Cir. 2004).[7]

Defendant's mootness defense fails to satisfy the above criteria, including <u>Sheely</u>, on all factors.

First, Defendant's own litigation conduct fails <u>Sheely</u>'s requirement that it admit liability. If it had admitted liability at the inception of this action, this case would not have gone to trial.

Second, Defendant fails the requirement in <u>Sheely</u> that its change of conduct not be in response to the litigation. To the contrary, the only reason the Defendant implemented any alterations was in direct response to this action and for the purpose of divesting this Court of jurisdiction and evading the consequences of violating the ADA.   In <u>Houston v. Southern Management Corp.</u>, 2:13-cv-164-UAM, DE 46 (M.D. Fla. 10/31/13), one Middle District Court applied this element as it is plainly stated and held that fixing items in response to lawsuit fails the requirements of <u>Sheely</u>.

Third, Defendant fails to demonstrate that the challenged discrimination was isolated and unintentional, as opposed to continuing and deliberate. First, even after being sued and moving the handicap parking space, Defendant allowed the new space to become again cluttered with obstructions and remain in that condition for many weeks. Defendant claims to be sophisticated, with an engineering background. Defendant claims to have fixed the violations himself and

---

[7]See also <u>Dow Jones & Co. v. Kaye</u>, 256 F.3d 1251, 1255 n.4 (11th Cir. 2001);  <u>Burger King Corp.</u>, 955 F.2d at 684 (in non-moot case, cessation came "on the eve of trial"); <u>Nat'l Adver. Co. v. City of Fort Lauderdale</u>, 934 F.2d 283, 286 (11th Cir. 1991) (in non-moot case, cessation came six weeks after suit followed the next day by motion to dismiss); <u>Jager v. Douglas County Sch. Dist.</u>, 862 F.2d 824, 833-34 (11th Cir. 1989);   <u>Hall v. Bd. of Sch. Comm'rs</u>, 656 F.2d 999, 1000 (5th Cir.1981); <u>City of Waco v. Envtl. Prot. Agency</u>, 620 F.2d 84, 86-87 & n.10 (5th Cir. 1980) (in non-moot case, cessation came "only six days before oral argument").

presents his own testimony on the issue of compliance. Defendant fails to explain how it is then

that he allowed those conditions to exist so many years prior to the filing of this action.

Defendant's intentional disregard and continuing practice is made plain by the facts surrounding

the handicap parking spaces. First, the placement of the dumpster and heavy equipment in the

original space were so obviously a violation of the rights of disabled persons that intent can be

plainly inferred. See  Dowdell v. City of Apopka, Florida, 698 F.2d 1181, 1186 (11th Cir. 1983).

Even if not obvious, the fact that this was a violation of law was brought to Defendant's attention

when the Plaintiff filed the complaint. Defendant then moved the parking space, constructed a

new space, and filled it with new obstructions: the furniture. Thus, Defendant made its new space

unusable even after being sued. This was brought to Defendant's attention when served with

Plaintiff's expert report in June 2017. Despite this, Defendant still allowed the furniture to

remain in place at least until Plaintiff filed an Affidavit on August 21, DE 48-1, revealing that the

obstructions remained in place.

As stated above, Defendant's discrimination was obvious, intentional and continuous. Its

claims of repentence disingenuous and made solely to divest this Court of jurisdiction. Indeed,

the Defendant had already returned to its old ways even after being sued.  Defendant therefore

fails to meet the stringent requirements of Sheely.

<u>Moveable Items And Failure To Maintain Violations Cannot Be Mooted</u>

Courts that have granted mootness dismissals in ADA cases generally justify such rulings

on the notion that they involve architectural elements, such as being made of concrete or firmly

affixed to structural items. As such, courts explain, they constitute a "unique subset" and

exception to Sheely.  See Houston v. 7-Eleven, Inc., 13-60004, DE 85, at 2-3 (S.D. Fla.

1/31/2014) (Scola, J.)("The fundamental rational supporting these [unique subset] cases is that the alleged discrimination cannot reasonably be expected to recur since structural modifications permanently undo the offending conduct.").  In other words, courts that grant mootness decisions under the ADA distinguish themselves from Sheely on the notion that structural elements are permanent in nature.

Obstructions, movable items, failure of policy and procedure and failure to maintain do not fall within this "unique subset" of structural elements. Therefore, they are not distinguishable from Sheely and thus cannot be mooted simply because a defendant claims to have removed them.  These would include (1) the storage of the dumpster and heavy equipment in the original handicap parking space; (2) the storage of furniture in the newly constructed  parking space; (3) mop bucket and trash can in the restroom; (4) unsecured floor mats in the restroom and store entrance[8]; and (5) faded paint in the original handicap parking space.

Ample authorities hold that movable obstructions of features required to be accessible is the kind of violation that cannot be mooted simply because a Defendant removes them after being sued. In Lieber v. Macy's West, Inc., 80 F.Supp.2d 1065 (N.D. Cal. 1999), the court held that the defendant's moving racks that obstructed pathways to defeat jurisdiction did not moot a lawsuit. In Watanabe v. Home Depot, Inc., 2003 U.S. Dist. Lexis 27012 (C.D. Cal. 2003), it was held that the defendant's practice of storing items in the disabled access aisles violated the ADA and their removal in response to a lawsuit did not moot the case. In Clavo v. Zarrabian, 2004 U.S. Dist. LEXIS 29324, *9 (C.D. Cal. 2004), it was held that blocking access to an accessible feature violates the ADA and policy of correction did not moot the case.  In Crandall v.

---

[8]Defendant did not challenge this finding other than to claim it removed the mats.

Starbucks Corp., 2017 U.S. Dist Lexis 52156 (N.D. Cal. 2017), the court held that the defendant could not moot a case by removing merchandise displays that obstructed access to various parts of its store. In Madden v. Del Taco, Inc., 150 Cal.App.4th 294, 58 Cal.Rptr.3d 313, 320 (2007), it was held that a restaurant's placement of a concrete trash container on entrance ramp, which "appear[ed] to be a result of the affirmative conduct of [defendant]," constituted a failure to maintain.

At least one Circuit Court has ruled on the matter. In Chapman v. Pier 1 Imports (U.S.) Inc. (Chapman II), 779 F.3d 1001 (9th Cir. 2015), a wheelchair-bound plaintiff had argued that the defendant retail store's placement of merchandise and boxes in its aisles that blocked his access violated the ADA. The defendant responded that the barriers were only temporary because customers placed them in the aisle and staff regularly removed them[9]. The Ninth Circuit concluded that "removing one obstructing object does not assure accessible aisles where it is likely that soon thereafter another item will be moved and create a blockage." Id. at 1008.

The rationale behind such decisions is that, once a defendant defeats jurisdiction by removing an obstruction, there is nothing to prevent him from simply moving it back. In the instant case, that is precisely what happened.[10]

---

[9]In Chapman, a factual issue was raised whether the obstructions may have been put in place by customers and whether the employees were moving quickly enough to keep the spaces clear. By contrast, in the instant case it is clear that the no customer put the dumpster or heavy equipment in the original parking space, or stored the mop bucket in the restroom. Even if the defendant can credibly claim that it did not put the furniture in the second handicap parking space, it let that obvious obstruction remain for many weeks.

[10]While the unsecured floor mats do not constitute an "obstruction", they are prohibited by 2010 ADA Std. 302.1. For similar reasons, simply removing these mats does not moot the claim because the Defendant can simply move them back.

Several authorities have held that the violation of failure to maintain cannot be mooted simply because the defendant fixes the problem after being sued. Failure to maintain cannot be mooted even if the defendant fixes everything during the lawsuit. This constitutes conduct capable of repetition but evading judicial review. Heinzl v. Cracker Barrel, 2016 U.S. Dist. Lexis 58153 *74 (W.D. Pa. 2016).   This includes where the evidence shows that a condition once supposedly compliant is allowed to lapse into a state of non-compliance. Id., at *75, citing Thomas v. Branch Banking and Trust Co., 32 F. Supp. 3d 1266, 1271 (N.D. Ga. 2014)(where there is evidence that conditions see-saw between compliance and non-compliance, there is reasonable expectation that recurrence sufficient to defeat mootness challenge).

Moreover, at least one court has held that even structural remediations cannot be mooted. In Moeller v. Taco Bell Corp., 2007 WL 2301778, 2007 U.S. Dist. Lexis 60714 *23-24 (N.D. Cal. 2007), a court held that there are certain kinds of elements in a place of public accommodation that change frequently due to regular maintenance, remodels, repairs and normal wear and tear.  A court order is necessary *even on remediated items* because "evidence of the current compliant status of certain elements is not dispositive of whether the elements will continue to be compliant in the future." In his report, Plaintiff's expert opined that all such items tend to break down through normal wear and tear and are frequently replaced.  Indeed, the Defendant did not contest the statement that all such items are subject to wear and tear, breakdown and must be maintained. Defendant proved this statement true by allowing the paint in the handicap parking space to fade so badly and allowing obstructions to return to the handicap parking space. Therefore, Defendant failed to satisfy its formidable burden that any of its remediations are permanent.

In <u>National Alliance For Accessibility, Inc. v. McDonalds Corp</u>., 8:12-cv-01365, p. 11-12 (M.D. Fla. 12/06/13, the court denied the Defendant's motion for summary judgment based on mootness. The court held that because the specifications required by the ADA evolve, an entity which fails to comply with these evolving requirements cannot moot a case by waiting until a lawsuit is filed before it complies. Defendants in such cases, are guilty of an "ongoing indifference" to the ADA's changing requirements. In this regard, the Court noted the revisions to the ADA that occurred with the promulgation of the 2010 ADA Standards. The court held that a defendant's:

> "duty to comply is a continuing duty. The absence of complaints by disabled individuals does not completely explain Defendants' non-compliance with the ongoing requirements of the ADA. At this point any such entity has had a substantial opportunity to familiarize itself with the provisions of the ADA, as they evolve, and to comply with those provisions.
> ...
> **Defendant's implementation of a new policy and removal of the architectural barriers does not eliminate the possibility of future violation**, when the requirements of the ADA have been well publicized for many years. The requirements of the ADA have not remained fixed, and it is incumbent on Defendants to take note of evolving requirements. In this case, Defendants took no action to comply with the current requirements until after this case was filed. The risk remains that Defendants will resume the challenged conduct after this case is dismissed. (Emphasis added.)

The court further held that: "While some aspects of this case may have become moot, the Court finds that, at a minimum, the scope of an injunction directed to maintenance and future compliance remains at issue." <u>Id</u>., p. 12. See also <u>Moore v. Dollar Tree Stores, Inc.</u>, 85 F. Supp. 3d 1176, (E.D. Cal. 2015) (even after defendant fixed the operational pressure of exterior doors, evidence was disputed as to whether they reasonably could be expected to lapse into noncompliance); <u>Sawczyn v. BMO Harris Bank Nat'l Assn</u>., 8 F.Supp. 3d 1108 (D. Minn.

2014)(even accepting bank's assertion that its ATMs were now ADA compliant, the fact that they were not compliant prior to suit being brought was relevant both with respect to the issue of whether bank's compliance was voluntary and also with respect to the issue of whether bank's procedures were effective when violations went unnoticed and unrepaired for eighteen months).

In the case at bar, obstructions were observed on three separate occasions, spanning a continuous period of several months: twice by the Plaintiff and once by Plaintiff's expert. A court may disregard a defendant's self-proclaimed policy of compliance where it is contradicted by the obvious facts.  Moeller v. Taco Bell Corp., 2007 WL 2301778 *8 (N.D. Cal. 2007)(where the defendant's self-proclaimed policy of compliance is contradicted by the obvious facts). These obstructions, and the faded paint, demonstrate that Defendant does nothing to maintain its features and allows them to lapse into a state of non-compliance.

Defendant failed to meet its formidable burden of demonstrating that the challenged conduct cannot reasonably be expected to recur. It did not prove to the Court that, in the absence of injunctive relief, Defendant won't simply return to its old ways. Indeed, it already did return to its old ways when it filled a new handicap parking space to become cluttered with new obstructions.

**Defendant Failed To Meet Its Formidable Burden Of Proving Claims Of Structural Violations Are Moot**

Even Defendant's claims that it has remediated the structural violations are simply not credible.

First, although Defendant presented the testimony of two contractors, they only testified with respect to the cost of widening the restroom. Conspicuously absent is any testimony from

any qualified expert that the facility is compliant. Obviously, they inspected the restroom in which Defendant claims to have fixed everything, but were silent as to whether it was compliant.

Second, in lieu of providing any expert report or testimony, Defendant attempts to serve as his own expert and relies on his own claims to have fixed all the violations and rendered the facility compliant. While Defendant asserts his credentials as an engineer, he fails to explain how, with his claim of special knowledge, he allowed so many obvious violations to exist for so many years. Moreover, Defendant evidences no qualifications to competently testify that he has rendered any condition compliant. Testimony by a lay witness is insufficient as speculative. Lieber v. Macy's West, Inc., 80 F.Supp.2d 1065, 1078 (N.D. Cal. 1999).

Third, Defendant made these new factual claims only after the discovery period had already expired[11], thus preventing Plaintiff from conducting further discovery to verify or rebut these assertions and substantially prejudicing the Plaintiff. To this extent that the Defendant's testimony serves as expert testimony, it should be stricken. Courts have widely excluded expert testimony based on reports that were tendered after the applicable disclosure deadline. See, e.g., Goodman v. Staples The Office Superstore, LLC, 644 F.3d 817, 826 (9th. Cir. 2011); Walter Int'l Productions, Inc. v. Salinas, 650 F.3d 1402, 1412-13 (11th Cir. 2011); Vance v. Ball State University, 646 F.3d 461, 469 (7th Cir. 2011); Mee Industries v. Dow Chemical Co., 608 F.3d 1202, 1221-1222 (11th Cir. 2010); Mann v. Taser Intern., Inc., 588 F.3d 1291, 1311 (11th Cir. 2009); Romero v. Drummond Co., 552 F.3d 1303, 1321-23 (11th Cir. 2008); Reese v. Herbert, 527 F.3d 1253, 1265 (11th Cir. 2008).

---

[11]The time for discovery expired on June 16, 2017. Defendant waited until August 14, 2017, when it submitted his affidavit, DE 44-1.

Fourth, Defendant's assertions of compliance are simply contradicted by the facts.  Mr. Herrera found that many of the remediations previously made by the Defendant were still non-compliant, the Defendant having substituted one violation with another. For example, even after relocating the handicap parking space, Defendant either filled it himself with obstructing furniture or allowed it to remain there for a period of many weeks.

Defendant's claims of remediations are simply not credible. It is not Plaintiff's burden to prove that the case is not moot. Rather, it is the Defendant's "formidable burden" to prove that it is. Defendant's testimony and evidence falls woefully short of this requirement.

<u>The Distinction Between Mootness And Standing</u>

An important distinction exists between mootness and standing.  In <u>Friends Of The Earth</u>, the Supreme Court differentiated between the plaintiff's requisite personal interests in the outcome of the litigation as of the time of commencement (standing) as opposed to throughout the course of litigation after the suit has been filed (mootness).  528 U.S. at 189-90.  As an example, the Court cited <u>Los Angeles v. Lyons</u>, 461 U.S. 95 (1983), in which the victim of a police chokehold policy lacked standing because he could not credibly allege that he faced a realistic threat arising from the policy.  However, a moratorium on such a policy would not necessarily have rendered such a case moot if the initial standing requirements had been met. According to the Court, "The plain lesson of these cases is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness."  528 U.S. at 190.

According to the Court:

[I]f mootness were simply "standing set in a time frame," the exception to mootness that arises when the defendant's allegedly unlawful activity is "capable of repetition, yet

48

evading review" could not exist. When, for example,   a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action, <u>Olmstead v. L. C.</u>, 527 U.S. 581, 594, n. 6, [] (1999), despite the fact that she would have lacked initial standing had she filed the complaint after the transfer. Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum. See <u>Steel Co.</u>, 523 U.S. at 109 ("'the mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced'") (quoting <u>Renne v. Geary</u>, 501 U.S. 312, 320 (1991)).

With respect to the "important difference" between mootness and standing, the Court

stated that:

> Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To  abandon the case at an advanced stage may prove more wasteful than frugal.
> This argument from sunk costs does not license courts to retain jurisdiction over cases in which one or both of the parties plainly lacks a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died.

528 U.S. at 191-92.  Thus, the Supreme Court outlined the limited instances were a case becomes

moot: namely either settlement or death of the plaintiff.

Assertion of the mootness defense also fundamentally changes the barriers and violations

at issue. Defendant's assertion of the mootness defense renders all violations relevant. <u>See</u>

<u>Houston v. 2501 LLC</u>, 6:13-cv-973 (M.D. Fla. 3/24/14), defendant's mootness defense renders

all violations relevant).  In order to meet the formidable burden of demonstrating that

discrimination cannot recur (even at these stores), it must show that Plaintiff cannot again

encounter discrimination. See <u>Alcoa, Inv. v. Bonneville Power Admin.</u>, 698 F.3d 774, 786  (9th

Cir. 2012)(case not moot where there the same complaining party will likely suffer from the

same wrongful conduct again from the same defendant). Therefore, it is the Defendant's

"formidable burden" to show that all violations have been remedied.

Plaintiff Is Still Entitled To Effective Relief

Defendant claims that this case is moot because it has effectively provided all the

remedial relief to which plaintiff is entitled. This claim is unavailing. To the contrary, numerous

authorities have granted effective relief even after finding that all violations had been corrected.

In Watanabe, 2003 U.S. Dist. Lexis 27012, *13 (C.D. Cal. 2003), it was reasoned:

> "In addition, the ADA statute is clear that "either a continuing or a threatened
> violation of the ADA is an injury within the meaning of the Act." Pickern v.
> Holiday Quality Foods, Inc., 293 F.3d 1133, 1136 (emphasis added). Here, it is
> clear that Plaintiff can obtain relief through a permanent injunction prohibiting
> Defendant from blocking the handicap parking spaces. Consequently, because
> Plaintiff can obtain relief through a favorable ruling from the Court on his ADA
> claim, he has standing to maintain his claim.

In Moeller v. Taco Bell Corp., 816 F.Supp.2d 831 (N.D. Cal. 2011) the court held:

> [T]he central inquiry in any mootness challenge is whether changes in the
> circumstances existing when the action was filed have forestalled any meaningful
> relief. "[T]he question is not whether the precise relief sought at the time an
> application for injunctive relief was filed is still available. The question is whether
> there can be any effective relief." West v. Secretary of Dep't. of Transportation,
> 206 F.3d 920, 925 (9th Cir. 2000); see also San Francisco BayKeeper, Inc. v.
> Tosco Corp., 309 F.3d 1153, 1159 (9th Cir. 2002). So long as the court can grant
> some effective relief, it does not matter that the relief originally sought is
> unavailable due to changed circumstances. See Church of Scientology of Calif. v.
> United States, 506 U.S. 9, 12-13 [] (1992).

816 F.Supp.2d at 860.   In Moeller, the court held that the defendant could be ordered to maintain

its accessible features.  The court reasoned that, "A court need not address every violation in

order to conclude that violations are sufficiently widespread to necessitate a system wide

injunction. Rather, a court can enter such an injunction based on evidence that is "symptomatic"

50

of the defendant's violations, including "individual items of evidence [that are] representative of larger conditions or problems." *Id*. at 859.

Conclusion

For the foregoing reasons, this Court finds that Defendant violated the ADA, discriminated and discriminates against Plaintiff and other similarly situated disabled persons by: (1) violating 28 C.F.R. 36.211(a), which prohibits failing to maintain its accessible features; (2) violating numerous provisions of the ADAAG and 2012 ADA Standards, which prohibit the practice of allowing obstructions to impede upon and hinder spaces required to be kept clear; (3) violating 42 U.S.C. Section 12182(a), which prohibits failure to provide full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of its stores; (4) violating 42 U.S.C. Section 12182(b)(1)(A)(i), which prohibits the denial of the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages of its stores; (5) violating 42 U.S.C. Section 12182(b)(1)(A)(ii), failure to afford the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation equal to that afforded to other individuals; (6) violating 42 U.S.C. Section 12182(b)(2)(A)(ii), failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities;  (7) by violating 42 U.S.C. Section 12182(b)(2)(A)(iv) which prohibits a failure to remove architectural barriers in existing facilities, where such removal is readily achievable; (8)  by violating 42 U.S.C. Section 12182(b)(2)(A)(v) by failing to provide alternate methods for disabled persons to use the restroom; and  (9) by violating 42 U.S.C. Section 12183 by creating new violations in its modifications at the facility.

Therefore, Judgment is hereby entered in favor of Plaintiff and against Defendant. Defendant is hereby ordered as follows:

(1) Defendant shall bring its property into full compliance with the ADA and ensure that all goods, services and facilities are readily accessible to and usable by disabled persons. This will include providing an alternate method for disabled persons to use a restroom on the premises;

(2) Defendant shall remove all obstructions from any spaces required to be kept clear for disabled individuals and shall implement a policy, practice and procedure to ensure that such spaces remain free of obstructions; and

(3) Defendant shall implement a practice, policy and procedure of maintaining all accessible features to ensure that they are in proper operating condition and that all goods, services and facilities shall remain readily accessible to and usable by disabled persons.

(4) Plaintiff is deemed the prevailing party within the meaning of the ADA and shall be entitled to her reasonable attorney fees, costs and litigation expenses.